**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| SUNBEAM PRODUCTS, INC. d/b/a JARDEN CONSUMER SOLUTIONS, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) ) | Civil Action No. 3:09-CV-00791 REP |
| HAMILTON BEACH BRANDS, INC., ) HOMELAND HOUSEWARES, LLC, ) ALCHEMY WORLDWIDE LLC, ALCHEMY ) WORLDWIDE INC., AND BACK TO BASICS ) PRODUCTS, LLC, ) ) | |
| Defendants. ) ) | |

**SUNBEAM'S MEMORANDUM IN OPPOSITION TO
HOMELAND HOUSEWARES, LLC'S MOTION TO DISQUALIFY
SUNBEAM'S COUNSEL**

At the May 17, 2010 *Markman* hearing, Homeland argued vigorously that its '640, '362 and '944 patents were not relevant to Sunbeam's patent claims. Indeed, Homeland's counsel argued that it was "totally inappropriate" for the Court to consider those patents in determining the meaning of the term "cap." Subsequently, however, Homeland had an epiphany, and the once irrelevant patents became the basis for Homeland's motion to disqualify Sunbeam's counsel, Steptoe & Johnson.

Disqualification is warranted, Homeland argues, because Andrew Chen, an attorney now employed by Steptoe, drafted the '640 and '750 patent applications when he was employed by Homeland's counsel in 2003-04. While conceding that the '640 and '750 patent applications are public records, Homeland nevertheless asserts a conflict on the grounds that Mr. Chen

purportedly acquired confidences – Homeland's reasoning behind the terminology used in its patents – in the course of preparing those applications, and in the course of drafting a complaint in an infringement action for another patent.  This information is relevant, so the theory goes, because Sunbeam asserts that Homeland's '640, '362 and '944 patents support Sunbeam's claim construction.

Homeland's motion does not come remotely close to satisfying the high standard of proof that Homeland must meet to disqualify Sunbeam's counsel.  Rather, it was filed for an improper tactical purpose of delay.  Homeland's patents are wholly irrelevant to this action.  Indeed, *even Homeland* has argued that they are "totally inappropriate" for the Court to consider.  This case does not involve, let alone revolve around, the content or the interpretation of Homeland's patents or any information that Mr. Chen might possess.  Instead, the issue is whether Homeland's products infringe Sunbeam's patents.  As a result, Mr. Chen's patent application work for Homeland and Sunbeam's patent infringement action are not substantially related.  The Court should summarily deny Homeland's motion.

## FACTUAL BACKGROUND

### *Mr. Chen's Work for Homeland*

Contrary to Homeland's assertions, at no time did Mr. Chen develop a strong familiarity with Homeland's products, their components, Homeland's patent prosecution strategies, litigation strategies or settlement strategies.  *See* Declaration of Andrew Chen (Ex. 1).

Mr. Chen worked with numerous clients at Cislo, including Homeland.  The only work that Mr. Chen recalls that he did for Homeland pertained to the Magic Bullet® device.  Mr. Chen never spoke with anyone at Homeland regarding the inventions disclosed in the patent applications that led to U.S. Patent Nos. 6,817,750 ("the '750 patent") and 7,066,640 ("the '640

patent").  Mr. Cislo provided Mr. Chen with any invention disclosure or information that was used to draft the applications.  Mr. Chen has no recollection of ever receiving any information regarding Homeland's reasoning behind the terminology used in its patents, and he currently has no knowledge of any such reasoning.  While Mr. Chen drafted the patent applications, Mr. Cislo was ultimately responsible for reviewing and filing the patent applications.  Mr. Chen never spoke with anyone at Homeland regarding the drafts and/or revisions to the applications.  Chen Decl. ¶¶ 3, 5.

While listed as an eligible practitioner, Mr. Chen did not prosecute or transact any business before the USPTO relating to the patent applications that matured into the '750 and '640 patents.  A review of the file histories for the '750 and '640 patents (which are publicly available from the USPTO website, www.uspto.gov) shows that Mr. Cislo executed the papers associated with the filing of the patent applications.  Any prosecution conducted on these patent applications was conducted after Mr. Chen's departure from Cislo.  *Id.* at ¶ 6.

Mr. Chen has no recollection of speaking with Mr. Cislo regarding any communications with examiners at the USPTO regarding Homeland's patent applications that matured into the '750 and '640 patents.  Mr. Chen does not recall any substantive conversation with any examiners regarding the applications that led to the '750 and '640 patents.  In fact, a review of the file wrapper of these cases shows that there were no substantive communications regarding these applications.  *Id.* at ¶ 7.

Mr. Chen's assistant would generally draft the various reporting and status letters for Mr. Cislo's review and execution.  Generally, these letters were template-driven.  Without reviewing the redacted content in the letters attached as Exhibit 4 to the Cislo Declaration, Mr. Chen cannot determine whether they were template-driven.  *Id.* at ¶ 8.

- 3 -

Mr. Chen drafted the Petition to Make Special regarding the application leading to the '750 patent for Mr. Cislo's review and execution.  *See* Cislo Declaration, Ex. 5.  The Petition to Make Special allows an Applicant to have their patent application examined out of turn (i.e., examined sooner) provided that the Applicant pays a fee, accepts any restriction requirements, submits the results of a patentability search, and discusses how the claimed subject matter is patentable over the submitted references.  Again, all this material is available publicly at the USPTO website.  *Id.*

Mr. Chen has no recollection of Homeland's patent enforcement program or assessing Homeland's patent portfolio since none of Homeland's applications had matured into issued U.S. patents during Mr. Chen's tenure at Cislo.  Chen Decl. ¶ 10.

Mr. Chen had minimal exposure to patent litigation prior to joining and during his tenure at Cislo as a third-year associate.  In fact, Mr. Chen's involvement with drafting of the complaint in the *Homeland Housewares v. TriStar Products* matter was the first, if not the only, litigation matter he was involved with at Cislo.  Given Mr. Chen's complete lack of prior litigation experience in drafting the complaint, he was not in a position to formulate litigation strategy.  Mr. Chen had no recollection of discussing any pre-litigation strategy or matters with anyone at Homeland.  At the date of his departure from Cislo, June 11, 2004, there had been no further filings by Homeland in the case.  Mr. Chen joined Steptoe as an associate in the Century City, California office in 2006.  He has had no involvement with this action, except during Steptoe's conflict review (as explained below) and, subsequent to the filing of Homeland's motion, for his communications with Steptoe attorneys solely with respect to that motion.  *Id.* at ¶ 11.

***Steptoe's Conflict Review Procedure***

In the process of undertaking the representation of Sunbeam in this action, Steptoe identified and evaluated Mr. Chen's prior work for Homeland for potential conflict of interest, and properly determined that there was no substantial relationship between Mr. Chen's patent prosecution work for Homeland and Sunbeam's patent infringement claims. *See* Declaration of Alfred Mamlet (Ex. 2).

When a new client matter is opened, the requesting attorney must complete and sign a new matter form. Upon completion, the new matter form undergoes a business intake/conflict of interest review system that incorporates Steptoe's billing and ethics policies with defined procedures to accept the representation of each client and to open, close, and reactivate each client matter. This system requires specific business intake forms and a strict schedule of procedures. Mamlet Decl. ¶ 2.

This conflicts search involves a review of any actual or potential conflicts with Steptoe's current clients, former clients, co-defendants, or co-plaintiffs of the potential client and other parties that are either adverse or aligned with the potential client. The results of the database search are then forwarded to the originating attorney and practice group leader for review. *Id.* at ¶¶ 3-4.

All new matters require the approval of the relevant practice group leader, and the practice group leaders are responsible for resolving any substantive conflict issues that appear during the conflict review process. Similarly, the practice group leader is charged with determining whether any issue conflicts exist as to the proposed client or matter. *Id.* at ¶ 5.

No new matter may be formally accepted until a Firm-approved engagement letter is sent to the client for consent and signature. As a matter of professional ethics and Firm policy,

Steptoe has a rule that no privileged information be received from, and no legal advice given to, the subject client until the Firm is assured that no conflict exists. *Id.* at ¶ 6.

In December 2009, Mr. Mamlet, Steptoe's Intellectual Property Group Leader, received and reviewed the Conflict of Interest Report generated in response to the request to open the patent infringement matter for Sunbeam. Mr. Mamlet understood that Steptoe was being asked to represent Sunbeam in asserting patent infringement claims relating to Sunbeam's patents for blenders. The Conflict of Interest Report identified Homeland, among others, as an adversary. The Conflict of Interest Report also indicated that Andrew Chen had performed legal services for Homeland prior to joining Steptoe in 2006. *Id.* at ¶ 7.

To determine whether Mr. Chen's prior representation of Homeland created a conflict that would preclude Steptoe from representing Sunbeam in the patent infringement action against Homeland, Mr. Mamlet called Mr. Chen to discuss his work for Homeland. Mr. Chen explained that he had performed some patent prosecution work for Homeland. *Id.* at ¶ 8; Chen Decl. ¶ 13.

Based upon the information received from Mr. Chen, Mr. Mamlet concluded that Mr. Chen's patent prosecution work for Homeland and Sunbeam's patent infringement claims were not the same or substantially related.[1] Mr. Chen had not conducted a "freedom to operate" study, analyzed a Sunbeam assertion letter, or otherwise engaged in work on the Sunbeam patents at issue. Moreover, Sunbeam's infringement action did not challenge or even implicate Homeland's patents, including the patents issued pursuant to the applications prepared by Mr. Chen. Mamlet Decl. ¶ 9.

---

[1] Sunbeam acknowledges that Mr. Chen had an attorney-client relationship with Homeland while he was employed at Cislo & Thomas.

*__The Markman Hearing__*

Homeland's patents appeared for the first time in this case in connection with the *Markman* hearing. As the Court is aware, Homeland has asked the Court to assign convoluted definitions to such simple terms as "cap" in an attempt to rewrite Sunbeam's patents to avoid infringement. The Court referred to this as the "apex" of the process gone wrong. 5/17/10 Hearing Tr. at 5 ("The practice has evolved into trying to get one up on summary judgment, and this case presents the apex of the madness which claim construction has become . . . .").

In its *Markman* brief, Homeland first introduced figures from Homeland's accused products – (compare Dkt. No. 75 at 21 with Figures 15 and 16 of Homeland's patents in Dkt. No. 79 at 9) – to argue that such structures are not covered by Sunbeam's claims. (Homeland did not disclose that the drawings came from a Homeland patent.) Homeland also relied extensively on other extrinsic evidence in its attempt to avoid infringement.

Sunbeam objected to any use of extrinsic evidence, including Homeland's drawings. Sunbeam took the position that the simple terms of the patents required no construction, and extrinsic evidence was neither required nor appropriate. Sunbeam's Opening *Markman* Brief at 8 (citing *TIP Sys., LLC v. Philips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1372 (Fed. Cir. 2008); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (stating that extrinsic evidence is less reliable than the patent and its prosecution history because "[i]n the course of litigation, each party will naturally choose the pieces of extrinsic evidence most favorable to its cause, leaving the court with the considerable task of filtering the useful evidence from the fluff.")); Sunbeam's Reply *Markman* Brief at 3, 10.

Yet, while maintaining that Homeland's extrinsic evidence was irrelevant, Sunbeam could not allow it to go unrebutted. In its *Markman* Reply Brief, Sunbeam addressed

Homeland's patents to demonstrate the inconsistencies in the convoluted claim constructions proposed by Homeland.

Specifically, Homeland had proposed that the simple term "cap" in Sunbeam's claims must be a removable structure that cannot contain any holes and must completely cover a container. *See* Dkt. No. 75 at 5-10; 5/17/10 Tr. at 44, lines 21- 25. To rebut this argument and Homeland's improper use of this extrinsic evidence during *Markman*, Sunbeam demonstrated to the Court that Homeland, when it obtained its own patents, represented to the Patent Office that these same structures were indeed referred to as "caps," thus revealing the inconsistencies in Homeland's argument.[2] *See* Sunbeam *Markman* Reply Brief at 8-9.

Homeland's response to this revelation was to argue that its patents were of no probative value. At the *Markman* hearing, Homeland argued that its patents were irrelevant and should be disregarded:

> Mr. Cislo: [T]hose [Homeland] patents were filed many years after Sunbeam's patent was filed and is not something a person of ordinary skill in the art would have looked at at the time of the filing of the patent and is totally inappropriate to show the Court. To accept that some patent lawyer, myself or anyone else, would have used that term more generically outside and apart from this specification in this patent is improper. That is truly improper.

---

[2]   "When I use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean – neither more nor less."

"The question is," said Alice, "whether you can make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master – that's all."

Lewis Carroll, *Through the Looking-Glass, Alice's Adventures in Wonderland* (Hayes Barton Press, p.72).

5/17/10 Hearing Tr. at 57, lines 12-19.  The Court seemed to agree that Homeland's patents were

inapposite to how the claim terms of Sunbeam's patents would be understood by one of ordinary

skill in the art because they were filed later in time.  *See* 5/17/10 Hearing Tr. at 86, lines 15-23.

Having improperly injected its patents into the *Markman* process, Homeland has now

compounded its abuse by seeking to use those patents to disqualify Sunbeam's counsel.

### *The Standard of Review*

Disqualification of an attorney "is a serious matter which cannot be based on imagined

scenarios of conflict, and the moving party has a high standard of proof to meet in order to prove

that counsel should be disqualified." *Kronberg v. Larouche,* 2010 U.S. Dist. LEXIS 35097, * 5

(E.D. Va. April 9, 2010) (citations omitted).  The Court must balance several factors in deciding

a motion to disqualify, including a party's right to retain counsel of her choice, the substantial

hardship that could result from disqualification, and the public perception of and the public trust

in the judicial system.  *Id.; Sanford v. Comm. of Virginia,* 2009 U.S. Dist. LEXIS 113279, * 29-

32 (E.D. Va. Dec. 2, 2009).

The relevant rule in Virginia provides:

> A lawyer who has represented a client in a matter shall not
> thereafter represent another person in the same or substantially
> related matter if the interest of that person is adverse in any
> material respect to the interest of the former client unless the
> former client consents after disclosure.

Va. Rule of Prof'l Conduct 1.9(a).

There is a well-established analytical framework for reviewing motions for

disqualification on the basis of conflict of interest.  Initially, the Court must determine whether a

conflict exists, and if so, whether the drastic remedy of disqualification is warranted.  To support

its claim of conflict of interest, Homeland must establish that an attorney-client relationship

existed between Homeland and Mr. Chen and that the former representation and the current infringement suit are substantially related. *Lifenet, Inc. v. Musculoskeletal Transplant Foundation,* 2007 U.S. Dist. LEXIS 29058, * 5 (E.D. Va. April 19, 2007) (citations omitted). "Substantially related" has been defined to be "identical" or essentially the same. *Id.* The phrase has also been used to describe a scenario where "the lawyer could have obtained confidential information in the first representation that would have been relevant in the second." *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F. Supp. 724, 730 (E.D. Va. 1990) (quoting *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1266 (7th Cir. 1983)).

With these standards in mind, it is clear that Mr. Chen's work for Homeland and this action are not substantially related.

## I.     THE HOMELAND PATENTS ARE NOT RELEVANT HERE.

Homeland's newly-minted position that Mr. Chen's past representation and this action are substantially related is a complete reversal from its position at *Markman*.  Homeland cannot have it both ways.

Homeland's patents have nothing to do with this case.  The patent infringement issue in this case is whether Homeland's blenders, and the methods of using them, infringe Sunbeam's patents.  The infringement issues focus on whether Homeland's accused products contain each and every element of the asserted claims of Sunbeam's apparatus claims, and whether the methods it instructs consumers to use contain each and every element of Sunbeam's method claims.  Homeland's accused products, their specific features, and their methods of use, are gleaned from the products themselves, Homeland's product specifications, literature, and marketing and advertising materials.

Put simply, Homeland's patents are not accused of infringement; its products are. Indeed, there are key features of Homeland's products (the Flip Top Lids) not disclosed in its

patents that are central to the issue of infringement and which, according to Homeland, were not introduced into their products until 2009 – long after Mr. Chen's employ at Cislo & Thomas, and long after the 2003 filing date of Homeland's patents.  Accordingly, Homeland's patents are not and will not be relevant to this case.

Moreover, Homeland's patents are not the subject of a counterclaim, and they are not involved in the Defendants' invalidity defenses.  Neither Homeland nor any other Defendant has asserted them as prior art to Sunbeam's patents.  Indeed, as stated by Homeland at the *Markman* hearing and recognized by the Court, Homeland's patents were filed "many years after Sunbeam's patent" and therefore are not prior art to Sunbeam's patents.  5/17/10 Hearing Tr. at 57, lines 12-13.

Finally, even if they were somehow found to be relevant, the knowledge of the drafter is not.  The patent would be at issue for what it says, not for who wrote it.  After a patent had issued, the information contained within it is ordinarily regarded as public.  *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GMBH,* 386 F.3d 1133, 1141 (Fed. Cir. 2004).  Nowhere in Mr. Cislo's declaration is there any statement that he conveyed to Mr. Chen Homeland's reasoning behind the terminology used in its patents.  Mr. Chen recalls no such communication, and currently has no knowledge on that subject.  Accordingly, Homeland cannot rely on its patent applications to conjure a conflict, nor can it invoke non-public "reasoning behind the terminology" when there is no evidence in this record that such reasoning ever existed, let alone that it was conveyed to Mr. Chen.

Homeland relies on *Stratagene v. Invitrogen Corp.*, 225 F.Supp.2d 608 (D. Md. 2002). *Stratagene* provides a dramatic contrast with Homeland's motion here, illustrating the circumstances that warrant disqualification.  In *Stratagene,* the plaintiff filed a complaint for

infringement of its '772 patent.  Invitrogen filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement of the '772 patent.  The court disqualified Invitrogen's counsel because she had represented Stratagene in connection with an application for a patent that derived from the same original parent application as the '772 patent at issue in the case.

Stratagene's original patent application was filed in December 1993.  In February 1994, Stratagene filed a separate patent application, called a "continuation-in-part" of the December 1993 application.  The continuation-in-part application was assigned a serial number and referred to as the '791 application.  Stratagene prosecuted the continuation-in-part application, which ultimately resulted in the issuance of the '772 patent in September 1996.  In September 1995, Stratagene filed another continuation application, which was given the serial number '767 application.  Stratagene asserted that both the '791 and '767 continuation applications were derived from the text of the original application filed in December 1993.

During the litigation, Stratagene learned that the defendant's counsel had represented Strategene concerning the '767 application.  Because the '767 continuation application derived from the original parent patent application, which ultimately resulted in the issuance of patent '772, the court concluded that potentially revealed confidences regarding the '767 application could be relevant to the infringement action concerning the '772 patent.  Since the '767 application was a continuation of the original application that matured into the '772 patent, the court concluded that the '772 patent and the '767 continuation application were substantially related.

*Stratagene* is inapposite because Homeland's patents are neither in dispute nor relevant in this action.  There is no claim for infringement, invalidity, or unenforceability relating to any

Homeland patents.  Any work performed by Mr. Chen on Homeland patent applications, or knowledge gleaned in that process that is not included in the applications, is simply not at issue here.  This case does not involve the content or interpretation of any information that Mr. Chen might possess.  Any confidences that Mr. Chen received in his previous representation of Homeland – and there is nothing in this record to show that he received such confidences in connection with Homeland's now-public patent applications – are not relevant to determining whether Homeland infringed Sunbeam's patents, and therefore the matters are not substantially related.

## II.    THE *TRISTAR* ACTION.

Finally, Homeland asserts that Mr. Chen's participation in *Homeland Housewares LLC v. Tristar Products, Inc.*, No. 04-CV-2831 (C.D. Ca. 2004) provided him with significant Homeland litigation confidences.  Mem. at 12.  This argument is no better than frivolous.

The complaint in the *Tristar* action was filed on April 23, 2004; Mr. Chen left Cislo's employ on June 11, 2004.  Homeland's disqualification motion does not assert, nor could it, that during the short-lived Chen-Homeland relationship, Mr. Chen played a material role in Homeland's litigation.  Rather, Mr. Chen's litigation activity for Homeland, as a fourth year associate, was restricted in time, scope and substance to drafting the complaint (his first) and follow on matters.

Mr. Chen had no communication with Homeland, let alone any communication regarding Homeland's "litigation strategy" that Sunbeam could now use against it.  Nowhere in Mr. Cislo's Declaration is there any suggestion of what such a strategy might have entailed, or how any such strategy is relevant to this action.  Homeland's claim to a generalized "strategy" with regard to litigation or settlement is insufficient to disqualify opposing counsel.  *See The Nichols Agency, Inc. v. Enchanted Child Care, Inc.*, 537 F. Supp. 2d 774, 782 (D. Md. 2008) (citation omitted).

Significantly, Homeland does not assert that the *Tristar* action is substantially related to this action.  In the *Tristar* action, Homeland asserted a claim of patent infringement and other claims relating to Homeland's patent D487,668 ("the '668 patent").  *See* Chen Decl. Ex. A.  The "D" in front of the number, indicates that the '668 patent is a design patent.  A design patent covers the look of the design, not its functionality.  *Richardson v. Stanley Works, Inc.,* 597 F.3d 1288, 1293-94 (Fed. Cir. 2010).  The "ordinary observer" test is the sole test for determining whether a design patent has been infringed.  *Id.* at 1295 (citation omitted).  Thus the *Tristar* action only concerned whether the Tristar product looked like the drawings in Homeland's '668 patent and therefore infringed that patent.

The instant action does not involve design patents; it involves utility patents.  What Homeland's products look like (or their general appearance) is not at issue here.  What is at issue is whether the elements claimed in Sunbeam's patents – the structural or physical features of the claim – are present in Homeland's accused products and also whether the process steps claimed in Sunbeam's method claims are performed when Homeland's products are used.

## III.    THE TIMING OF HOMELAND'S MOTION.

Homeland's motion was filed after Sunbeam's motion to disqualify Dan Cislo, who is a necessary fact witness.  Sunbeam's motion could not have surprised Homeland, as Homeland knew from the beginning that Mr. Cislo could not be both a fact witness and an advocate.  The lack of any merit in Homeland's motion to disqualify Sunbeam's counsel, and Homeland's incessant prior efforts to delay this action, lead inexorably to the conclusion that it was filed  as a defensive reaction to Sunbeam's motion and as a tactical maneuver for purposes of delay.

## IV.    EFFICIENCY/HARDSHIP.

The substantial prejudice to Sunbeam from disqualification is manifest.  This action is far along and the scope of work performed by Steptoe here has been broad and substantial.  The

Court has conducted the *Markman* hearing, expert reports are due soon, depositions and other discovery will conclude in August, a summary judgment hearing is scheduled for October 5, and trial is set for January 10, 2011.  Substitute counsel would undoubtedly require several months to familiarize themselves with this case, disrupting the schedule.  In fact, Homeland's motion is but the latest step in its ongoing quest to delay this action.   Moreover, Homeland is the sole defendant seeking disqualification.

The Fourth Circuit has also counseled trial courts to avoid "a mechanical application" of the Virginia Rules of Professional Conduct:

> It behooves this court, therefore, while mindful of the existing Code, to examine afresh the problems sought to be met by the Code, to weigh for itself what those problems are, how real in the practical world they are in fact, and whether a mechanical and didactic application of the Code to all situations automatically might not be productive of more harm than good, by requiring that the client and the judicial system to sacrifice more than the value of the presumed benefits.

*Aetna Cas. & Sur. Co. v. United States,* 570 F.2d 1197, 1202 (4th Cir. 1978).[3]

---

[3] In *Aetna,* the Fourth Circuit was referring to the Virginia Code of Professional Responsibility, which was replaced by the Virginia Rules of Professional Conduct on January 1, 2000.  The current version of the Virginia rules is not substantively different from the 2000 version for purposes of this issue.

## V.   CONCLUSION.

For these reasons, the Court should deny Homeland's motion to disqualify Sunbeam's counsel.

Respectfully Submitted,


By:   _____/s/ J. William Koegel, Jr._____
J. William Koegel, Jr. (VSB No. 38243)
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
Tel. No.:   (202) 429-6408
Fax No.:   (202) 429-3902
wkoegel@steptoe.com

*Counsel for Plaintiff Sunbeam Products, Inc. d/b/a*
*Jarden Consumer Solutions*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of June, 2010, I will electronically file the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

*Counsel for Defendant Homeland Housewares, LLC, Alchemy Worldwide, Inc., and Alchemy Worldwide LLC:*

Robert E. Scully, Jr. (VSB No. 19218)
STITES & HARBISON PLLC
1199 North Fairfax Street, Suite 900
Alexandria, Virginia 22314
Phone:   703.739.4900
Fax:        703.739.9577
rscully@stites.com

Daniel M. Cislo
Mark D. Nielsen
CISLO & THOMAS LLP
1333 2nd Street, Suite 500
Santa Monica, CA 90401-4110
Phone:   310.451.0647
Fax:        310.394.4477
dan@cislo.com
mnielsen@cislo.com

*Counsel for Defendant Hamilton Beach Brands, Inc.:*

Brian C. Riopelle (VSB No. 36454)
Robert M. Tyler (VSB No. 37861)
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, VA 23219-4030
Phone:   804.775.1000
Fax:        804.775.1061
briopelle@mcguirewoods.com
rtyler@mcguirewoods.com

By:   _____/s/   J. William Koegel, Jr._____
          J. William Koegel, Jr. (VSB No. 38243)
          Steptoe & Johnson LLP
          1330 Connecticut Avenue, NW
          Washington, DC 20036
          Tel. No.:  (202) 429-6408
          Fax No.:  (202) 429-3902
          wkoegel@steptoe.com

          *Counsel for Plaintiff Sunbeam Products, Inc. d/b/a Jarden Consumer Solutions*