IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

F I L E
AUG 1 9 2010
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

SUNBEAM PRODUCTS, INC.
d/b/a JARDEN CONSUMER
SOLUTIONS,

      Plaintiff,

v.                              Civil Action No. 3:09cv791

HAMILTON BEACH BRANDS, INC.,
et al.,

      Defendants.

## MEMORANDUM OPINION

This matter is before the Court for claim construction of U.S. Patent Nos. 6,758,592 (the "'592 Patent") and 7,520,659 (the "'659 Patent").

### BACKGROUND

The Plaintiff, Sunbeam Products, Inc. ("Sunbeam") asserts claims for infringement of the '592 Patent and the '659 Patent (collectively the "Patents-in-Suit") against the Defendants, Hamilton Beach Brands, Inc. ("Hamilton Beach"), Homeland Housewares, LLC ("Homeland"), Alchemy Worldwide, LLC ("Alchemy"),[1] and Back to Basics Products, LLC ("Back to Basics"). The Patents-in-Suit relate to

---

[1] The alleged infringement of Alchemy and Homeland are both based upon their production and/or marketing of the "Magic Bullet®" product.

1

vessels attached to blending bases whereby blended contents may be consumed, with the aid of a "drinking cap," directly from the vessel after blending. Though the claims differ, the specifications of the '592 and '659 patents are "identical."

The parties have offered eight claim terms, several of which overlap, for construction.

## DISCUSSION

### I. Legal Standard

The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The construction or interpretation of a claim is a question of law. <u>Id.</u>

A term should be construed by the Court whenever there is an actual, legitimate dispute as to the proper scope of the claims. <u>O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.</u>, 521 F.3d 1351, 1360 (Fed. Cir. 2008). However, "a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims." <u>Id.</u>

Furthermore, some claim terms will be so simple that "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005). And, "a sound claim construction need not always purge every shred of ambiguity. The resolution of some line-drawing problems -- especially easy ones . . . -- is properly left to the trier of fact." Acumed LLC v. Stryker Corp., 483 F.3d 800, 806 (Fed. Cir. 2007). As recognized in O2 Micro, "district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims . . . . Claim construction 'is not an obligatory exercise in redundancy.'" 521 F.3d at 1362 (quoting U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

Generally, the words of the claim are to be given their ordinary and customary meaning, i.e. the meaning that the term would have "to a person of ordinary skill in the art in question at the time of the invention," read in the context of the entire patent, including the specification. Phillips, 415 F.3d at 1312-13 (Fed. Cir. 2005). "[I]n

interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification, and, if in evidence, the prosecution history . . . Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996); <u>see also</u> <u>Phillips</u>, 415 F.3d at 1314 (stating that courts look to the words of the claims, the specification and the prosecution history to understand the meaning of a claim term). Of these, the words of the claim should be the Court's controlling focus. <u>See</u> <u>Phillips</u>, 415 F.3d at 1314; <u>see also</u> <u>Digital Biometrics, Inc. v. Identix, Inc.</u>, 149 F.3d 1335, 1344 (Fed. Cir. 1998).

If the intrinsic evidence is insufficient to resolve ambiguity in the meaning of claims, the court may rely upon extrinsic evidence to understand the technology and to construe the claims. <u>Phillips</u>, 415 F.3d at 1317; <u>see also</u> <u>Vitronics</u>, 90 F.3d at 1584. "Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." <u>Vitronics</u>, 90 F.3d at 1584. Extrinsic evidence, however, may not be used to contract or expand the claim language or the meanings

4

established in the specification. _Phillips_, 415 F.3d at 1318-19; _Vitronics_, 90 F.3d at 1584. As explained in _Nystrom v. Trex Co.,_

> [I]n the absence of something in the written description and/or prosecution history to provide explicit or implicit notice to the public -- i.e., those of ordinary skill in the art -- that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by the context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.

424 F.3d 1136, 1145 (Fed. Cir. 2005). _Accord_ _Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc._, 554 F.3d 1010, 1018-19 (Fed. Cir. 2009).

Another pertinent precept is "claim differentiation." "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." _Phillips_, 415 F.3d at 1314-15 (citations omitted). In applying that precept to the claim before it, _Phillips_ further observed, citing _Dow Chem. Co. v. United States_, 226 F.3d 1334, 1341-42 (Fed. Cir. 2000), "that an independent claim should be given broader scope than a

dependent claim to avoid rendering the dependent claim redundant." _Phillips_, 415 F.3d at 1324.

Finally, claims are not to be construed with reference to the allegedly infringing device, a "procedure [that] would make infringement a matter of judicial whim." _Sri Int'l v. Matsushita Elec. Corp._, 775 F.2d 1107, 1118 (Fed. Cir. 1985).

## II. Claim Construction

The terms tendered for construction,[2] a number of which overlap considerably, are:

(1) "Cap," which appears in Claim 4 of the '592 patent;

(2) "Drinking cap," which appears in Claim 3 of the '592 patent and Claim 1 of the '659 patent;

(3) "Drinking cap having a drinking hole," which appears in Claim 1 of the '592 Patent;

(4) "Cap configured for . . . drinking from the container," which appears in Claim 10 of the '659 patent;

(5) "Drinking hole," which appears in Claim 9 of the '592 patent and Claim 8 of the '659 patent;

(6) "Closure member for selectively closing said drinking hole," which appears in Claim 10 of the '592 patent;

---

[2]    Although the chart of disputed claim terms appended to Sunbeam's opening brief as Exhibit D identifies "second removable cover" as a separately disputed claim term, Sunbeam indicates that both it and the Defendants' proposed construction of this term is the same as each party's construction of the term "cap." Pl. Memo. at 16 n.7.

> (7) "Open top portion," which appears in Claim 4 of the '592 patent; and
>
> (8) "Second removable cover for selectively covering said open top portion," which appears in Claim 4 of the '592 patent.

At the Initial Pretrial Conference on March 22, 2010, the parties indicated that, at most, "drinking cap" would be disputed. However, further areas of disagreement arose, resulting in the above list, which the Court considered during the claim construction hearing on May 17, 2010. The Court expressed considerable doubt during the hearing as to whether simple, common-usage terms such as "cap" and "drinking hole" required any construction at all, and whether such construction would effectively rewrite the patent, and prevent the jury from performing its proper fact-finding function. Supplemental briefing was ordered, and has been submitted, on the necessity of construing these claim terms.

Sunbeam has cited a substantial body of authority in which courts have declined to construe terms such as "melting" (<u>Biotec Biologische Naturverpackungen GmbH v. Biocorp, Inc.</u>, 249 F.3d 1341, 1349 (Fed. Cir. 2001)); "irrigating" and "frictional heat" (<u>Mentor H/S, Inc. v. Med. Device Alliance, Inc.</u>, 244 F.3d 1365, 1380 (Fed. Cir. 2001)); and "axle" (<u>Tesco Corp. v. Weatherford Intern.,</u>

_Inc._, ___ F.Supp.2d ___, 2010 WL 1443540, at *5 (S.D. Tex. Jan. 5, 2010), observing that "calling an axle a shaft does not add clarification to the term, nor does it solve any legitimate dispute as to the scope of the patents-in-suit").

However, cases such as _Tesco Corp._ implicitly recognize that, when the _scope_ of a patent or claim is in dispute, and definition of a common term helps to define the scope of the patent or claims therein, then construction may serve a useful purpose. Along these lines, the Defendants argue that it is not the complexity of the disputed terms that necessitates their construction, but rather "it is because Sunbeam chose imprecise, shifting claim language," Def. Supp. Brief at 13, in which a simple term such as "cap" may appear to have different meanings in different claims. Thus, the Defendants urge the Court to consider not just whether the term "cap" would require construction in isolation, but whether the various terms must be construed for purposes of clarifying their meaning within the Patents-in-Suit.

The Defendants note the principle that claims within a patent are to be construed such as to avoid rendering terms superfluous. As observed in _Haemonetics Corp. v. Baxter Healthcare Corp._,

> Patent claims function to delineate the precise
> scope of a claimed invention and to give notice
> to the public, including potential competitors,
> of the patentee's right to exclude. This notice
> function would be undermined, however, if courts
> construed claims so as to render physical
> structures and characteristics specifically
> described in those claims superfluous. As such,
> we construe claims with an eye toward giving
> effect to all of their terms, even if it renders
> the claims inoperable or invalid . . . .

607 F.3d 776, 781 (Fed. Cir. 2010) (citations omitted). In the present action, some of the claim terms that the Defendants dispute, although they are simple, would benefit from definitions that clarify the scope of the term within the various claims and within the Patents-in-Suit viewed holistically. In the absence of such construction, there could be substantial debate about whether some language within the claims is superfluous.

Resolution of the claim construction disputes is made more challenging by the lack of any intrinsic evidence to inform the articulation of a construction for any of the disputed claim terms. Moreover, none of the disputed terms are "technical" in the sense that they have a specialized meaning in the context of the art at issue, and all terms are readily understandable by laypersons. And, troublingly, the Defendants' proposed constructions are chock full of thinly veiled references to the allegedly infringing "Magic Bullet" device, which the Court may not

9

consider pursuant to clearly settled law of claim
construction. This unorthodox backdrop notwithstanding,
each term is construed below.

A. "Cap"

This claim term is the logical starting point for
claim construction because the definition of "cap" will
influence the definition of all of the other terms that the
Court needs to construe.

The Defendants' proposed construction of "cap" is "a
removable cover that completely covers a beverage container
or drinking container." Sunbeam's proposed construction is
"a removable structure adapted to mount to the end of a
container to cover the end of the container to some
extent." Thus, the parties' dispute focuses on the extent
to which the "cap" must cover the beverage container.

1. Words of the Claims

The language of Claim 4 of the '592 patent describes
the following claim:

> a beverage container having an open top portion
> and a closed bottom portion;
>
> a first removable cover for selectively covering
> said top portion of said container, said first
> cover adapted to be removably mountable on and
> off a blender and comprising an adapter portion
> for mounting said container on a blender; and
>
> a second removable cover for selectively covering
> said open top portion of said container, said

10

second cover comprising a <u>cap</u>, and wherein said
first and second covers are interchangeable on
said container.

'592 Patent at 20:53-63 (emphasis added).

### 2. Specification and Prosecution History

The specification describes the function of the cap,

which is also referred to as a "removable cap." <u>Id.</u> at

11:39-59. The cap is described, in context of its use as

an appurtenance to a single-serving beverage container, as

follows:

> The single serving beverage container 38 (shown
> also in FIG. 19) is slightly tapered along its
> length, and preferably is sized to fit into a
> user's hand as well as a typical beverage holder
> in automobiles. A <u>removable cap</u> 198 (FIG. 2) is
> provided that may be screwed onto the male
> threads 196. The <u>removable cap</u> 198 may include a
> drinking hole, and/or may include a closure tab
> to avoid spillage.

> To use the single serving beverage container 38,
> the <u>cap</u> 198 is removed (if present), and beverage
> ingredients are placed in the single serving
> beverage container 38. The agitator collar 190
> is then screwed onto the male threads 196. . . .
> The single serving beverage container 38 and the
> agitator collar 190 are then inverted (FIG. 19)
> and installed on the blender base 32. The
> beverage ingredients may then be mixed and/or
> blended by the blender base 32. The agitator
> collar 190 and the single serving beverage
> container 38 are then removed, inverted, and the
> agitator collar is screwed off of the single
> serving beverage container. The <u>cap</u> 198 may then
> be screwed onto the single serving beverage
> container 38, and the single serving beverage
> container is ready for use.

11

_Id._  The specification implies that the cap is intended to be used to facilitate drinking, because drinking is the standard use for beverage containers. However, it is also conceivable that a cap could be used to store the beverage and prevent spillage.

Neither party discusses any prosecution history surrounding the term "cap." The term does not appear to have engendered any dispute during prosecution of the '592 patent. Indeed, this is common to all of the claim terms containing the word "cap." _See_ Pl. Memo. at 12 ("[T]here is nothing in the prosecution history of either patent-in-suit that changes the ordinary meaning of "drinking cap having a drinking hole.'"); _id._ at 15 ("[A]gain, there is nothing in the prosecution history of the patents that changes the ordinary meaning of the term 'drinking cap.'"). _See also_ Def. Memo. at 9 ("The '592 Patent file history does not appear to modify the definition of 'cap' from Defendants' position."); _id._ at 12 (finding no history relevant to the term "drinking cap having a drinking hole"); _id._ at 19 (noting the lack of history pertinent to the term "cap configured for . . . drinking from the container").

### 3. Extrinsic Evidence

The only extrinsic evidence in the record is a dictionary definition of "cap," submitted by the Defendants to attack Sunbeam's construction. Although Sunbeam complains that the dictionary is from 2010, as opposed to 2001, which is the date the initial patent application was filed, there is no reason to believe the definition of "cap" has changed since then. The lay definition of "cap" proffered by the Defendants is "[a] protective cover or seal, especially one that closes off an end or a tip: *a bottle cap; a 35-millimeter lens cap.*" Def. Exh. 1 at 3. Sunbeam, in its reply, sets forth a definition of "cover" (which is used synonymously with "cap" throughout the patents) as "something that is placed over or about another thing," and lists "lid" and "top" as synonyms.

### 4. Proper Construction of "Cap"

The Defendants have adduced no reason to construe "cap," one of the more basic nouns in the English language. There is nothing about any of the claim language that would require "cap" to be defined differently in different contexts. Thus, as to this claim term, no construction is required -- no benefit to claim scope or clarity would accrue from defining a cap in terms of synonyms such as "lid" or "cover." Cf. Tesco Corp., ___ F. Supp. 2d ___,

2010 WL 1443540, at *5. And, to adopt a construction that favored either partial or complete coverage of the container would be to effectively rewrite the patent, which is not within the Court's province in claim construction.

B. "Drinking Cap"

The Defendants' proposed construction of "drinking cap" is "a removable cover that completely covers a beverage container or drinking container, and allows a user to drink a beverage through said removable cover by means other than a hole." Sunbeam's proposed construction is "a removable structure adapted to mount to the end of a container to facilitate drinking." Again, the parties dispute the extent to which the "drinking cap" must cover the beverage container, while also disagreeing as to whether the cap "facilitates" drinking or "allows" drinking.

1. Words of the Claim

Claim 3 of the '592 patent describes "[a] method of mixing ingredients in a drinking container, comprising:

placing ingredients in a drinking container;

attaching a blade base to the drinking container;

inverting the blade base and drinking container;

attaching the blade base to a motorized blender base and operating the blender base to mix the ingredients in the drinking container;

14

removing the blade base and drinking container from the blender base;

inverting the blade base and drinking container;

removing the blade base from the drinking container; and

attaching a <u>drinking ca[p]</u>[3] to the top of the drinking container.

'592 Patent at 20:35-49 (emphasis added). A "drinking cap" is also mentioned in Claim 1 of the '659 patent, "an independent apparatus claim," which is listed as "[a] blender assembly comprising:

a blender base;

a collar removably mountable on said blender base and having a first interface;

a blender jar removably mountable to said collar and having a second interface configured to mate with said first interface;

a beverage container removably mountable to said collar and having a third interface configured to mate with said first interface; and

a <u>drinking cap</u> removably mountable to said beverage container and having a fourth interface configured to mate with said third interface.

'659 Patent at 20:2-14.

2.   Specification and Prosecution History

"The term 'drinking cap' is not used in the common specification of either the '592 or '659 Patents."   Def.

---

[3]   The original text of the patent reads "a drinking can," which, in context, is an obvious typographical error.

15

Memo. at 15. Nor is any aspect of the term illuminated by the prosecution history.

### 3. Extrinsic Evidence

In addition to the lay dictionary definition of "cap" discussed earlier, the Defendants proffer a dictionary definition of "facilitate" to oppose Sunbeam's proposed construction that the drinking cap with the drinking hole "facilitate[s] drinking." The Defendants cite a definition of "facilitate" as "to make easy or easier," Merriam-Webster.com, and contend that a drinking cap having a drinking hole does not make drinking *easier*, but rather that it makes drinking *possible.* Def. Memo. at 13. Sunbeam counters, "[o]ne could obviously drink from a container that does not have a drinking cap, but the drinking cap simply facilitates the act." Reply at 11.

### 4. Proper Construction of "Drinking Cap"

As differentiated from the term "cap," the term "drinking cap" is necessarily narrower; it is a subset of "cap" that is not intended to be used purely for purposes of storing the vessel's contents, but rather one that is intended to be used for drinking. As differentiated from the narrower disputed claim term "drinking cap having a drinking hole" (which is necessarily a subset of "drinking cap") discussed <u>infra</u>, a "drinking cap" includes not just a

16

cap with a hole through which a person may drink. It also includes a cap with a notch or other portion cut out so that the cap itself does not have a hole, but that the user has an opening through which to drink when the cap is affixed. Thus, with such a "holeless" drinking cap, drinking from the vessel is possible while the cap is in place despite the absence of a hole in the cap itself. See Sunbeam Oral Argument Slide 26. This explains the distinction between Claim 4 of the '592 Patent, 20:51-63 (describing a cap "selectively covering [the] open top portion of the container") and Claim 9, 21:6-7 (stating that "[t]he assembly of claim 4, wherein said cap has a drinking hole formed therein"), which implies that there is a type of drinking cap that does not have a drinking hole. In comparing the terms "drinking cap" and "drinking cap having a drinking hole," it is evident that the limitation "having a drinking hole" is not present in the claim term "drinking cap."

Additionally, the language of the claim specification respecting "cap" makes clear that any sort of cap -- including a "drinking cap" and a "drinking cap containing a drinking hole" -- contains an interface by which the cap screws onto the container. '592 Patent at 11:55-59

(describing the process by which "the agitator collar is screwed off" and "[t]he cap may then be screwed on[]").

The record shows that the claim language, liberally interpreted, does not produce any lack of clarity or inconsistency when the term "drinking cap" is defined in terms of its plain and ordinary meaning. Although, as the Defendants argue, the "holeless drinking cap" to which Sunbeam points as evidence to show the distinction between the claim terms may be shown not to be practicable in the context of a screw-on interface, or may be shown not to have been embodied in a product, it shows how the plain language of the terms does not produce any confusion as to the scope of any claim term.

Thus, the term "drinking cap" is construed as "a cap which, when screwed onto the beverage container, allows a person to drink the contents of the beverage container." Although the cap may indeed facilitate drinking, the crucial distinction to be drawn between "cap" and "drinking cap" is that the latter necessarily enables drinking while the cap is affixed.

C.    "Drinking Cap Having a Drinking Hole"

The Defendants' proposed construction of "drinking cap having a drinking hole" is "a removable cover that completely covers a beverage container or drinking

18

container, said removable cover having a hole therein that is substantially smaller than the circumference of the beverage container cover or drinking container cover, and through which a user can drink a beverage." Sunbeam's proposed construction is "a removable structure adapted to mount to the end of a container to facilitate drinking having an opening of any size through which a user can drink." Thus, the parties disagree as to whether the claims contain any inherent limitation on the size of the drinking hole in relation to the size of the opening of the beverage container.

### 1. Words of the Claims

The language of Claim 1 of the '592 patent states:

> a drinking container having a first interface at its top;
>
> a blade base removably mountable on and off a blender and having a blade unit thereon and a second interface thereon, the second interface configured to mate with the first interface, the blade base and the drinking container forming a sealed container; and
>
> <u>a drinking cap having a drinking hole</u> and a third interface, the third interface configured to mate with the first interface.

'592 Patent at 20:22-34 (emphasis added).

### 2. Specification and Prosecution History

The parties identify the same specification language as raised with respect to the term "cap." As noted above,

19

the '592 Patent specification, at 11:39-59, notes that "[t]he removable cap 198 may include a drinking hole, and/or may include a closure tab to avoid spillage." The specification further notes that "[t]he cap 198 may then be screwed onto the single serving beverage container 38, and the single serving beverage container is ready for use." This would evidently apply whether or not the cap has a drinking hole.

The prosecution history does nothing to clarify the term. See Def. Memo. at 12 (finding no history relevant to the term "drinking cap having a drinking hole").

### 3. Extrinsic Evidence

Other than dictionary definitions of "cap" and "facilitate," discussed above in reference to the term "drinking cap," there is no extrinsic evidence presented that relates to the proper construction of "drinking cap with a drinking hole."

### 4. Proper Construction of "Drinking Cap Having a Drinking Hole"

For the reasons described above with respect to the proper construction of the term "drinking cap," a "drinking cap having a drinking hole" is simply a subset of the term "drinking cap." In practice, it is likely that most drinking caps have a hole through which the person drinks,

but not all drinking caps necessarily have such a hole. Thus, the plain language of the claims distinguishes the terms, and there is little for the court to construe.

The term "drinking cap having a drinking hole" is thus construed as "a cap which, when screwed onto the beverage container, allows a person to drink the contents of the beverage container through a hole in the cap."

D.  **"Cap configured for . . . drinking from the container"**

The Defendants' proposed construction is "a removable cover that completely covers or encloses a beverage container or drinking container shaped or arranged to allow for drinking therethrough." Sunbeam proposes the following construction:  "a removable structure adapted to mount to the end of a container to facilitate drinking from the container."  This is essentially the same as Sunbeam's proposed construction for the term "drinking cap," and the differing constructions proposed by both parties indicate that the dispute over this term is the same dispute that envelops the term "drinking cap."  Examination of the record reveals that the two terms have identical meanings.

1.  **Words of the Claim**

Claim 10 of the '659 Patent describes "a method of blending, comprising

> providing a blender assembly comprising a blender
> base having a motor, a collar having an agitator,
> a container, and a <u>cap configured for</u> mounting on
> and <u>drinking from the container</u> . . . .

'659 Patent at 20:34-38 (emphasis added). Claims 11 and 12

also reference this cap, but add nothing substantive.

### 2.    Specification and Prosecution History

The only relevant specification cited by either party

is identical for the language cited above relating to the

term "cap."    Similarly, the prosecution history is

unhelpful.    <u>See</u> Def. Memo. at 19 ("The '659 Patent file

history does not appear to modify the definition of 'cap

configured for . . . drinking from the container.'").

### 3.    Extrinsic Evidence

No extrinsic evidence is presented applicable to this

claim term.

### 4.    Proper Construction of "Cap configured for .
### . . drinking from the container"

Sunbeam proffers a construction that is substantially

identical to the construction it proffers for "drinking

cap."    The construction of "drinking cap" -- which is

narrower than "cap" but broader than "drinking cap having a

drinking hole" -- is adopted for this term as well.

Nothing in the record suggests that the terms have any

different meaning.    Therefore, the term is construed as "a

cap which, when screwed onto the beverage container, allows a person to drink the contents of the beverage container."

### E.   "Drinking Hole"

The Defendants' lengthy proposed construction is "an opening in the beverage container cover or drinking container cover that is substantially smaller than the circumference of the beverage container cover or drinking container cover, and through which a user may drink the liquid in the beverage container or drinking container." Sunbeam's proposed construction is "an opening of any size through which a user can drink the fluid within the container." As with "drinking cap having a drinking hole," the parties dispute the existence of an inherent limitation on the size of the drinking hole in relation to the size of the opening of the beverage container.

### 1.   Words of the Claim

The term "drinking hole" appears within two claims in the Patents-in-Suit. First, it appears in Claim 9 of the '592 patent, a dependent claim that reads:   "The assembly of claim 4, wherein said cap has a drinking hole formed therein."   '592 Patent at 21:6-7 (emphasis added).   The term also appears in Claim 8 of the '659 patent, which reads "The assembly of claim 1, wherein said drinking cap

23

comprises a drinking hole and a closure tab to avoid spilling." '659 Patent at 20:28-29 (emphasis added).

## 2. Specification and Prosecution History

The common specification describes the "drinking hole" in reference to the cap that affixes to the beverage container:

> The single serving beverage container 38 (shown also in FIG. 19 is slightly tapered along its length, and preferably is sized to fit into a user's hand as well as a typical beverage holder in automobiles. A removable cap 198 (FIG. 2) is provided that may be screwed onto the male threads 196. The removable cap 198 may include a <u>drinking hole</u>, and/or may include a closure tab to avoid spillage.

There is nothing in the prosecution history, other than that already discussed above, specific to the term "drinking hole."

## 3. Extrinsic Evidence

Neither party has adduced any extrinsic evidence pertinent to the term "drinking hole."

## 4. Proper Construction of "Drinking Hole"

The proper construction of the term is . . . . "a hole in a drinking cap covering the beverage container, said hole being designed to allow the user to drink the contents of the beverage container while the cap is affixed atop the beverage container." Obviously, the term "drinking hole"

24

cannot be used in a manner that is inconsistent with the term "drinking cap having a drinking hole."

### F. "Closure member for selectively closing said drinking hole"

The Defendants' proposed construction is "a closure member that the user chooses to engage or disengage in which the closure member, when engaged, completely covers the drinking hole (subject to the definition of 'drinking hole'). Sunbeam's proposed construction is "a structure adapted to cover the drinking hole to some extent ('drinking hole' being defined above)." Thus, the parties agree that this term incorporates the definition of the term "drinking hole," but dispute whether the "closure member" operates as a binary open/closed switch, or as a device that allows for varying degrees of closure. Sunbeam also asserts that the member need not effect only a complete closure.

### 1. Words of the Claim

Claims 9 and 10 of the '592 patent provide the relevant claim language framework for construction:

> 9. The assembly of claim 4 ["beverage container assembly for use with a blender"], wherein said cap has a drinking hole formed therein.

> 10. The assembly of claim 9, wherein said cap further comprises a <u>closure member for selectively closing said drinking hole</u>.

'592 Patent at 21:6-10 (emphasis added).

## 2. Specification and Prosecution History

The specification includes minimal discussion of this disputed claim term. The '592 patent does note that "[t]he removable cap 198 may include a drinking hole, and/or may include a closure tab to avoid spillage." '592 patent at 11:44-45.

In terms of the prosecution history, the Defendants cite the "Flores Reference," Def. Memo. at 23-24. The patent examiner references "Flores," which is a shorthand reference to a patent that discusses a "selectively actuated closure member for [a drinking] hole." The examiner observed that "a container . . . may be used for either storage or drinking of beverages," and, as such, the closure member is designed with these two types of uses in mind, "to allow for selective drinking and dispensing of the stored beverage." Pl. Exh. 6, Part 2, at SB000171. The Defendants argue that, because the prosecution history references two types of uses, that supports a limitation that the closure member should have only two settings: open and closed. Sunbeam responds that "[t]he Examiner said nothing about the extent to which the closure member closes when actuated, nor did he indicate that the closure

member completely covers the hole when actuated or engaged."

### 3. Extrinsic Evidence

Neither party has submitted extrinsic evidence pertinent to this claim term.

### 4. Proper Construction of "Closure member for selectively closing said drinking hole"

Neither Sunbeam's nor the Defendants' proposed construction is accurate in its entirety. There is nothing in the language of the claim or specification that limits "selective" closure to binary on/off selection. The claim encompasses degrees of closure that may include partial closure. However, Sunbeam's argument that "closure member" could refer to a device that does not allow for *complete* closure of the drinking hole is not reasonable.

Thus, the proper construction of the claim term is "a structure adapted to cover the drinking hole to an extent that the user may select, including fully open and fully closed, and which may allow the user to select a degree of opening somewhere between fully open and fully closed."

### G. "Open Top Portion"

The Defendants' proposed construction is "the cross-sectional area spanning the circumference of the top of the

27

container including the rim to its outer diameter and all portions therein." Sunbeam's proposed construction is "a portion of the container opposite the closed bottom portion of the container, said portion having an interface and an area that is not closed." Thus, the parties dispute whether the term necessarily includes an interface.

### 1. Words of the Claim

Claim 4 of the '592 patent includes the disputed claim term, in the following context:

> A beverage container assembly for use with a blender, comprising:
>
> a beverage container having an <u>open top portion</u> and a closed bottom portion;
>
> a first removable cover for selectively covering <u>said top portion</u> of said container, said first cover adapted to be removably mountable on and off a blender and comprising an adapter portion for mounting said container on a blender; and
>
> a second removable cover for selectively covering said <u>open top portion</u> of said container, said second cover comprising a cap, and wherein said first and second covers are interchangeable on said container.

'592 Patent at 20:50-63 (emphasis added). Claim 8 also references the disputed claim term, by claiming "[t]he assembly of claim 4, wherein said first and second cover each comprises a screw thread for engaging said <u>open top portion</u>." <u>Id.</u> at 21:3-5 (emphasis added).

### 2. Specification and Prosecution History

The specification and prosecution history say virtually nothing about "open top portion." It is not surprising that the patent's authors saw no need to define this self-explanatory term. The Defendants deceptively assert several figures showing an opening on the top of a container, proffering them as examples of an "open top portion" with misleading captions designed to make it appear as if the figures in the original patent were so captioned. However, the language of the specification does not discuss an "open top portion" as such, and, indeed, the Defendants set forth figures of a "blender jar" that is not the single-serving "beverage container" in question.

### 3. Extrinsic Evidence

Neither party has provided any extrinsic evidence on the term "open top portion."

### 4. Proper Construction of "Open Top Portion"

The open top portion must contain a screw-on interface. This is implicit in the overall language of the claim, which notes in numerous places that the interface by which the beverage container attaches to both the blender base and the various caps is of the screw-on variety. Thus, Sunbeam's construction is the proper one, and is adopted here: "a portion of the container opposite the

29

closed bottom portion of the container, said portion having an interface by which a cap screws onto the beverage container and an area that is not closed."

### H. "Second removable cover for selectively covering said open top portion"

The Defendants' proposed construction is: "a removable cover that the user chooses to engage or disengage in which the cover, when engaged, completely covers the open top portion of the container (subject to the definition of 'open top portion')." Sunbeam's proposed construction is: "a removable structure adapted to mount to the end of a container to cover the end of the container to some extent." As the Defendants note, the parties agree that "cover" means "cap" and that this definition incorporates the construction of "open top portion," leaving the sole area of disagreement as the phrase "selectively covering."

#### 1. Words of the Claim

The relevant claim language is the same as for the term "open top portion:"

A beverage container assembly for use with a blender, comprising:

a beverage container having an open top portion and a closed bottom portion;

a first removable cover for selectively covering said top portion of said container, said first

cover adapted to be removably mountable on and off a blender and comprising an adapter portion for mounting said container on a blender; and

a second removable cover for selectively covering said open top portion of said container, said second cover comprising a cap, and wherein said first and second covers are interchangeable on said container.

'592 Patent at 20:50-63 (emphasis added).

### 2.   Specification and Prosecution History

The Defendants assert the following specification language as supportive of their construction:

A removable cap 198 (FIG. 2) is provided that may be screwed onto the male threads 196. The removable cap 198 may include a drinking hole, and/or may include a closure tab to avoid spillage.

\* \* \*

The cap 198 may then be screwed onto the single serving beverage container 38, and the single serving beverage container is ready for use.

By the Defendants' reasoning, the phrase "may be screwed onto the . . . beverage container" reveals that the "selection" contemplated within the words "selectively covering" is one of whether or not to screw on the cap.

There is nothing in the prosecution history pertinent to this claim term. Although the Defendants reassert the "Flores reference," that was made respecting prior art that does not appear relevant to claim construction. Def. Memo. at 29; Sunbeam Exh. E, part 2, at SB000169-71.

31

### 3. Extrinsic Evidence

Neither party has submitted any pertinent extrinsic evidence.

### 4. Proper Construction of "Second removable cover for selectively covering said open top portion"

Nothing in the record reveals any greater specificity or any limitations regarding this claim term. Although the phrase "selectively covering" could be construed as a simple selection of whether or not to affix the cap, it could also refer to a selection within the cap itself of how much of the open top portion should be covered, through a device such as a "closure member."

Thus, the proper construction of the claim term is: "a cap that either allows the user to cover the drinking hole, through a mechanism such as a closure member to an extent that the user may select, including fully open and fully closed, and which may allow the user to select a degree of opening somewhere between fully open and fully closed; or a cap that may be screwed onto the beverage container by the user and which covers some or all of the open top portion."

## CONCLUSION

For the reasons set forth above, the disputed claim terms in the Patents-in-Suit are to be construed as reflected herein.

_____/s/_____ _ℝℇℙ_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 19, 2010